**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**UNITED STATES OF AMERICA**

        v.                       **CRIMINAL ACTION NO.  3:07cr83**

**GARY D. WHITE,**

        Defendant.

*MEMORANDUM OPINION & ORDER*

Before the Court is Gary D. White's ("Defendant") Motion to Offer Expert Testimony on Eyewitness Identification at Defendant's Trial.  Having carefully reviewed the parties' pleadings, and after holding a hearing on this matter on June 13, 2007, the Court finds this matter ripe for judicial determination.  For the reasons below, Defendant's Motion to Offer Expert Testimony is **DENIED**.

**I.  FACTUAL AND PROCEDURAL HISTORY**

On December 16, 2006, at approximately 1:19 a.m., Fort Lee Police Officer Troy A. Catterton observed a grey Dodge Intrepid traveling westbound on Route 36 near Fort Lee, Virginia. Officer Catterton noticed that the Intrepid did not have a functioning rear license plate.  Officer Catterton initiated a traffic stop of the Intrepid and called in the license plate number to the dispatcher.  Officer Catterton approached the driver and asked for his driver's license and registration.  The driver pulled some papers out of the glove box.  The driver then told Officer Catterton that he did not have his license or registration, and asked Officer Catterton whether he

could call his girlfriend to bring his license to him. The dispatcher then announced over Officer Catterton's radio that the license plate was expired. The driver asked, "What's wrong?" Before Officer Catterton could respond, the driver drove off. The Government maintains that the traffic stop lasted between five and ten minutes because Officer Catterton was stalling in an attempt to wait for the Virginia Criminal Information Network to come online.

After the Intrepid drove off, Officer Catterton got in his vehicle and initiated pursuit. Officer Catterton eventually found the Intrepid in Petersburg. The car had damaged a street sign, and it had been driven through a ditch onto a median. The driver's door was open and the vehicle was empty. The car had sustained substantial damage and was no longer operable. Petersburg police arrived, and they informed Officer Catterton that the vehicle had been reported stolen from Chesterfield County. They also told Officer Catterton that there was an outstanding arrest warrant for a Gary White in relation to the stolen vehicle charge. The Government states that Officer Catterton gave the driver's description to the Petersburg police, and that the next morning the Petersburg police called Officer Catterton to look at a subject they had located in the area. Officer Catterton determined that the subject was not the driver of the Intrepid.

Officer Catterton learned that Gary White had been arrested by Chesterfield County, and on December 30, 2006, Officer Catterton asked Chesterfield County to send a copy of the arrest photograph of Gary White. Officer Catterton viewed the photograph on December 31, 2006. Officer Catterton immediately recognized White as the driver of the Intrepid from the December 16, 2006 incident. On January 22, 2007, a federal arrest warrant was issued for Gary White for felony eluding.

On February 12, 2007, Officer Catterton was again on patrol on Route 36 near Fort Lee. At approximately 7:10 p.m., Officer Catterton saw a burgundy Dodge Intrepid traveling eastbound with a defective headlight. Officer Catterton pulled the vehicle over and recognized the driver as Gary White. The driver told Officer Catterton that his name was Gary White. Officer Catterton then arrested him on the outstanding warrant. Officer Catterton testified at the preliminary hearing that he is one hundred percent sure that Gary White was the person driving the Intrepid on December 16, 2006.

## II.  LEGAL STANDARD

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court established the standard for the admissibility of expert testimony pursuant to Federal Rule of Evidence 702. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* decision rejected the prior rigid "general acceptance" test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and established a new two-part test for the admissibility of expert testimony. *See Daubert*, 509 U.S. at 589, 592-93. Under *Daubert*, when a court is "[f]aced with a proffer of expert scientific testimony," the court "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or

determine a fact in issue." *Id.* at 592. In determining whether the "scientific knowledge" prong is satisfied, a court may consider:

> (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; and (4) the degree of the method's or conclusion's acceptance within the relevant scientific community.

*United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995). In determining whether the evidence will be helpful to the trier of fact, the United States Court of Appeals for the Fourth Circuit ("the Fourth Circuit") has stated that "a judge must be mindful of other evidentiary rules," specifically Federal Rule of Evidence 403. *Id.* Rule 403 permits the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." The Supreme Court has stated that a trial judge must be particularly concerned with Rule 403 with regard to expert testimony because of the difficulty in evaluating expert evidence. *Daubert*, 509 U.S. at 595. Finally, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court held that the *Daubert* test applies to all expert testimony falling under Rule 702.

The proponent of expert testimony has the burden of establishing admissibility by a preponderance of the evidence. Fed. R. Evid. 104; *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). "In making its [admissibility] determination [a court] is not bound by the rules of evidence except those with respect to privileges." Fed. R. Evid. 104(a). In addition, "a trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." *Dorsey*, 45 F.3d at 814.

In *United States v. Harris*, 995 F.2d 532, 534-36 (4th Cir. 1993), the Fourth Circuit held that the district court was correct in excluding the defendant's proffered expert testimony on the

reliability of eyewitness identification. The Fourth Circuit stated that a court "should consider whether the testimony is within the common knowledge of the jurors," and if so, it should be excluded. *Id.* at 534-35. The *Harris* court noted an evolving trend toward allowing expert testimony on the validity of eyewitness identification in certain "narrow circumstances." *Id.* The court stated that these circumstances "have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference." *Id.* at 535. The *Harris* court further stated that, "Outside of such narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." *Id.* In holding that the eyewitness expert was properly excluded, the *Harris* court considered it significant that there were three eyewitnesses with three identifications on three separate occasions combined with other evidence that placed the defendant at the scene of the crime. *Id.* at 535-36. The *Harris* court also noted that race did not play a role, and all of the identifications except for one were not under stressful conditions. *Id.* at 536.

Although *Harris* preceded *Daubert*, the Fourth Circuit affirmed the *Harris* "common knowledge" rule after *Daubert* was decided in *Dorsey*. *Dorsey*, 45 F.3d at 815. *Dorsey* was concerned with proposed expert testimony that would have compared surveillance photographs of the defendant with more recent photographs, in order to bolster the defendant's mistaken identity defense. *Id.* at 812. The Fourth Circuit affirmed the district court's exclusion of the expert testimony, stating that the testimony failed both *Daubert* prongs. *Id.* at 815. First, the defendant did not show that the proposed evidence amounted to "scientific knowledge." *Id.* at 814. Second, the

Fourth Circuit stated that under the "common knowledge rule" of *Harris*, "there is no indication that the expert testimony was at all necessary in the instant case; as noted by the district court, the comparison of photographs is something that can sufficiently be done by the jury without help from an expert." *Id.* at 815.

Both *Daubert* and *Harris* were applied in a thorough discussion of the admissibility of expert testimony on the validity of eyewitness identification in *United States v. Lester*, 254 F. Supp. 2d 602, 607-10 (E.D. Va. 2003). In *Lester*, the government's case rested "almost entirely on the identification testimony of two eyewitnesses to the crime who separately identified [the defendant] approximately six weeks after the crime in a photospread prepared by an agent of the Bureau of Alcohol, Tobacco and Firearms . . . ." *Id.* at 603. The *Lester* court first held that the proffered expert testimony satisfied the first prong of *Daubert*, the reliability test. *Id.* at 607. In analyzing the second *Daubert* test, whether the testimony will be helpful to the trier of fact, the *Lester* court stated that under the common knowledge rule, "In eyewitness identification cases, the Court should assess each factor about which an expert intends to testify and determine whether that factor is one about which the average juror would be aware." *Id.* at 608. The *Lester* court also stated that, "Second, and relatedly, trial courts should remain cognizant of the efficacy of traditional methods of trial procedure to equip the jury with information from which it may fairly assess the credibility of eyewitnesses." *Id.* The *Lester* court noted that:

> [E]ven if the proponent of the expert testimony on eyewitness reliability demonstrates that the factor affecting reliability of an identification is not clearly common knowledge, the testimony may still run afoul of Rule 403 if the expert cannot adequately explain to the jury in concrete terms the degree of impact on accuracy that the factor has been demonstrated to have.

*Id.* at 609.  The *Lester* court stated that information on the degree of impact on accuracy is crucial for the jury because otherwise the jury would be unable to properly utilize the expert's opinion or assess the expert's credibility, possibly allowing the "aura" of the expert testimony to confuse the jury.  *Id.*

### III.  DISCUSSION

Defendant seeks to admit the testimony of Brian Cutler, Ph.D.  Dr. Cutler is a psychologist and an expert in the field of eyewitness identification.  Defendant requests that Dr. Cutler be allowed to testify as to four distinct factors which may have affected the accuracy of Officer Catterton's eyewitness identification:  (1) accuracy and confidence; (2) cross-race recognition; (3) mug shot commitment effect; and (4) show up procedure.  As a preliminary matter, the Court finds that Dr. Cutler's proffered testimony satisfies the "scientific knowledge" part of the *Daubert* inquiry.  With respect to the accuracy and confidence, cross-race recognition, and mug shot commitment effect factors, Dr. Cutler testified at the June 13, 2007 *Daubert* hearing that each of these factors had been the subject of numerous scientifically conducted studies, with the results published in multiple scientific peer-reviewed journals.  In addition, Dr. Cutler testified that his conclusions as to these factors are generally accepted among scientists who study eyewitness memory.  With respect to show up procedure, Dr. Cutler would base his testimony on field identification procedure guidelines promulgated by the Department of Justice, Office of Justice Programs.  The Government did not challenge the authenticity of these guidelines at the *Daubert* hearing, only Defendant's application of them to the instant case.  The Government has not questioned that Dr. Cutler's proposed testimony passes the *Daubert* scientific knowledge test, and the Court finds that it does meet the scientific knowledge test.  A detailed analysis of this test is not critical to the Court's decision.

The Court must now consider whether Dr. Cutler's proposed testimony will "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The Court will separately examine each of Dr. Cutler's four proposed areas of testimony to assess helpfulness to the jury. First, however, there are two underlying points in particular that bear mention.

First, unlike *Lester* and other cases admitting expert testimony on eyewitness identification, the eyewitness in the instant case is a trained police officer. Officer Catterton served as a military police officer for the United States Army for six years. He has been trained to be constantly observant of his surroundings, especially the people he encounters on the job. He has been specifically trained to observe and remember the faces he comes across so that they may be later identified. This is in sharp contrast to the participants in Dr. Cutler's cited studies, the majority of whom were college students. Dr. Cutler testified at the *Daubert* hearing that there were only a very small number of studies that directly involved law enforcement officers, and that there were even fewer that had been published in prominent journals. He testified that in some studies law enforcement officers were found more capable of describing what they had seen than lay witnesses. Dr. Cutler was unable to state exactly how the observational training and experience of a police officer such as Officer Catterton would impact his conclusions.

Second, there is evidence other than Officer Catterton's eyewitness identification that links Defendant to the stolen Dodge Intrepid. The Fourth Circuit in *Harris* noted that one factor in analyzing the appropriateness of allowing expert testimony on eyewitness identification is the amount of evidence in the case apart from the eyewitness identification. *Harris*, 995 F.2d at 535. At the *Daubert* hearing, the Government stated that it had evidence from the scene of the Intrepid's theft linking Defendant with the theft. This evidence included Defendant's name and description.

Although Officer Catterton is the only eyewitness who places Defendant at the wheel of the Intrepid on December 16, 2006, there is other evidence connecting Defendant to the stolen car. Therefore, although perhaps the "evidentiary cornucopia" of *Harris* is not present, *see id.*, there is other inculpatory evidence in the Government's case than simply Officer Catterton's testimony.

**A. Accuracy and Confidence**

Dr. Cutler proposes to testify that there is only a "modest" correlation between confidence and accuracy in eyewitness identifications. In other words, an extremely confident eyewitness is more likely to be accurate than a less confident eyewitness, but only by a modest amount. Although Dr. Cutler testified that this conclusion is counter-intuitive, Dr. Cutler could not quantify his conclusions sufficiently so as to make them helpful to a jury. In this respect, this Court reaches a different conclusion than the *Lester* court on this factor. *See Lester*, 254 F. Supp. 2d at 613 (holding that the expert had sufficiently quantified the impact of the accuracy-confidence factor). Dr. Cutler did not refute the common-sense notion that, holding everything else constant, a more confident eyewitness is more likely to be accurate. He would only add that the confidence-accuracy correlation is "modest," or, less than one may believe. As scientifically sound as this conclusion may be, the Court believes that such vague guidance would only serve to confuse a jury. The Court is particularly mindful of the Supreme Court's warning in *Daubert* that Rule 403 should factor prominently in weighing the admissibility of expert testimony because of the difficulty jurors have in evaluating it. *Daubert*, 509 U.S. at 595; *see also Dorsey*, 45 F.3d at 816 ("Because in the instant case, the district court was concerned that the expert testimony would confuse and mislead the jury, the district court did not abuse its discretion in excluding the testimony."). This difficulty in evaluation is exacerbated when, as in the instant case, an expert provides an opinion but cannot

quantify how much of an impact his own conclusions should have on the facts. Officer Catterton has testified that he is one hundred percent confident in his identification of Defendant. Upon hearing Dr. Cutler's confidence-accuracy testimony, a jury would naturally become confused as to how to weigh that evidence in light of Officer Catterton's confidence.

**B. Cross-race Recognition**

In the instant case, Officer Catterton is white and Defendant is black. Dr. Cutler proposes to testify that a cross-race identification is less reliable than a same-race identification. First, as with the accuracy-confidence factor, the Court finds that Dr. Cutler could not sufficiently quantify the impact of this factor to be helpful to a jury. *See Lester*, 254 F. Supp. 2d at 613-14 (reaching the same conclusion). Second, Dr. Cutler qualified his conclusions on cross-race recognition by stating that the initial exposure time between the eyewitness and the identified person impacts this factor. A short exposure time (thirty seconds) increases the likelihood of erroneous cross-racial identification. The exposure times in the studies referenced by Dr. Cutler varied between thirty seconds and two minutes. The exposure time between Officer Catterton and the suspect on December 16, 2006 is in dispute, but appears to have been between five and ten minutes. Officer Catterton testified that he observed Defendant at the side of the car for about eight to ten minutes. This difference in exposure times is significant, and makes the studies cited by Dr. Cutler less relevant. Therefore, not only is the initial conclusion as to cross-race identification too vague to be helpful, the additional factor of longer exposure time adds an additional unquantified variable to the equation.

**C. Mug Shot Commitment Effect**

Officer Catterton identified Defendant from his mug shot prior to their encounter on February 12, 2007. Dr. Cutler proposes to testify that exposure to a mug shot decreases the accuracy of a later

identification, especially if the eyewitness mistakenly identifies the mug shot. This factor, however, is within the scope of jurors' common sense. It is hardly surprising that viewing a mug shot first may prejudice a later identification. Common sense combined with skillful cross-examination are more than sufficient to fully explore this factor. Dr. Cutler's expert testimony on the mug shot commitment effect will not be helpful to the jury.

**D. Show Up Procedure**

Finally, Officer Catterton identified Defendant using a show up procedure, where the only photograph he viewed was Defendant's booking photograph. Dr. Cutler would testify that, based on the publication "Eyewitness Evidence: A Guide for Law Enforcement" by the Department of Justice, Office of Justice Programs, several steps should have been taken to increase the accuracy of Officer Catterton's identification. Specifically, Dr. Cutler mentioned at the *Daubert* hearing that a photographic array would have been less suggestive. However, Dr. Cutler is not particularly informed on standard police procedures, and Officer John Roeleveld, a police training officer, testified at the *Daubert* hearing that show up procedures are routinely used among police officers. Furthermore, Officer Roeleveld testified that he was familiar with the Department of Justice guidelines at issue and that they were used primarily with lay witnesses.

The Court does not find that Dr. Cutler's testimony with respect to the suggestiveness of a show up would be helpful to a jury. Again, "deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." *Harris*, 995 F.2d at 535. Dr. Cutler's testimony on the show up identification procedures used is unnecessary and unhelpful to the jury.

## IV.  CONCLUSION

For the reasons stated above, Defendant's Motion to Offer Expert Testimony on Eyewitness Identification at the Defendant's Trial is **DENIED**.

The Clerk is **DIRECTED** to mail a copy of this Memorandum Opinion & Order to the parties.

**IT IS SO ORDERED**.

_____/s/_____
Raymond A. Jackson
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June 15, 2007